### FIRE INSURANCE AND THE ANTI-TRUST LAW.

[Common Pleas Court of Ashtabula County.]

STATE, EX REL TAYLOR, PROSECUTING ATTORNEY, v. ALBERT
ROSS ET AL.

Decided, May 5, 1906.

*Monopoly—Restrictions and Agreements by Fire Insurance Agents—In
Contravention of the Valentine Anti-trust Law—Words and
Phrases—Criminal Law.*

The provisions of the Valentine Anti-trust law include the business of
fire insurance, and an indictment which charges the defendants
with unlawfully conspiring, combining and agreeing together to re-
strict the "trade, business and commerce of insuring property," and
to fix and increase the premiums therefor and prevent competi-
tion, charges a crime under the laws of Ohio.

ROBERTS, J.; METCALF, J., concurs.

Heard on demurrer to indictment.

The grand jury returned an indictment against Albert Ross
and twenty-eight others, the first count of which charges that
they—

"on the thirtieth day of December, in the year of our Lord
nineteen hundred and three, with force and arms, in said county
of Ashtabula and state of Ohio, unlawfully did conspire, com-
bine, confederate, and agree together, to create and carry out
restrictions in the trade, business, and commerce of insuring
property against loss and damage by fire, lightning, and tor-
nado; and to increase the price of such insurance and to prevent
competition in the making, sale, and purchase of such insur-
ance; and to fix the price, premium, and rate of such insurance
at a standard and figure whereby its price to the public and to
the consumer shall be established and controlled; and to make,
enter into, execute, and carry out contracts, obligations, and
agreements to keep the price of such insurance at a graduated
figure, to not sell or dispose of such insurance below a common
standard and fixed value, to establish and settle the price of
such insurance between themselves and between themselves and
others so as to preclude a free and unrestricted competition
among themselves in the sale thereof, and to pool, combine, and
unite their interests in the sale of such insurance so as to effect
the price thereof" and they

"then and there unlawfully acted with, were members of, and aided in carrying out the purposes of an unlawful trust and combination known as Ashtabula County Underwriters' Association, then and there being and existing for each and all of the aforesaid purposes and which said trust and combination did then and there unlawfully effect and accomplish each and all of the aforesaid purposes, contrary to the form of the statute in such case made and provided and against the peace and dignity of the state of Ohio."

The second and third counts differ from the first count only in alleging different dates. To this indictment the defendants, Albert Ross and Isaac Hewitt, have demurred severally, and all other defendants jointly. The demurrers are alike and allege the following reasons:

"First. The facts stated and alleged in the said first, second and third counts in said indictment do not constitute, in either of said counts, an offense punishable by the laws of the state of Ohio.

"Second. That the facts stated and alleged in the first, second and third counts in said indictment, are not sufficient in either of said counts, to constitute an offense or crime under the laws of the state of Ohio.

"Third. The facts stated and alleged in said first, second and third counts in said indictment do not constitute in either of said counts, an offense punishable under Chapter 19 A, entitled 'trusts,' of the Revised Statutes of Ohio.

"Fourth. The intent is not alleged in either the first, second or third counts of said indictment and proof of such intent is necessary to make out the offense charged."

This indictment was intended to be based upon the Stewart-Valentine Anti-trust law, so-called, and is found in 93 O. L., 13 (Revised Stat. 4427-1). The law, so far as pertinent in this consideration, reads as follows:

"An act to define a trust and to provide for criminal penalties and civil damages, and punishment of corporations, persons, firms and associations, or persons connected wth them, and to promote free competition in commerce and all classes of business in the state.

"Section 1. Be it enacted by the General Assembly of the state of Ohio, that a trust is a combination of capital, skill or acts by two or more persons, firms, partnerships, corporations or association of persons or of any two or more of them for either any or all of the following purposes:

"1.   Too create or carry out restrictions in trade or commerce.

"2.   To limit or reduce the production, or increase, or reduce the price of merchandise or any commodity.

"3.   To prevent competition in manufacturing, making, transportation, sale or purchase of merchandise, produce or any commodity.

"4.   To fix at any standard or figure whereby its price to the public or consumer shall be in any manner controlled or established, any article or commodity of merchandise, produce or commerce intended for sale, barter, use or consumption in this state.

"5.   To make or enter into or execute or carry out any contracts, obligations or agreements of any kind or description, by which they shall bind or have bound themselves not to sell, dispose of or transport any article or any commodity or any article of trade, use, merchandise, commerce or consumption below a common standard figure or fixed value, or by which they shall agree in any manner to keep the price of such article, commodity or transportation at a fixed or graduated figure, or by which they shall in any manner establish or settle the price of any article, commodity or transportation between them or themselves and others, so as to directly or indirectly preclude a free and unrestricted competition among themselves or any purchasers or consumers in the sale or transportation of any such article or commodity, or by which they shall agree to pool, combine or directly or indirectly unite any interests that they may have connected with the sale or transportation of any such article or commodity, that its price might in any manner be affected. Every such trust as is defined herein is declared to be unlawful, against public policy and void."

The questions involved in the consideration of these demurrers have been learnedly and exhaustively argued by counsel for the state and for the defendants, both orally and by briefs submitted, even to the extent of going beyond the legal propositions before the court and embracing a discussion concerning the business of fire insurance generally, its purposes, its methods and its profits, which makes it proper to remark that in a consideration of these demurrers the court has nothing to do with the guilt or innocence of the defendants, with the manner of doing business by insurance companies, or agents, their designs or acts, or with the facts whatever they may be, embraced in the transactions alleged in the indictments.

The demurrers admit the truth of the allegations of the indictment, and considering them true, say that they do not

constitute an offense under or punishable by, the laws of Ohio, and that they do not constitute an offense under the provisions of the Stewart-Valentine law. In other words, and briefly stated, the issue is whether the business of insurance is included in, or provided for, in said law. If it is not, the demurrers should be sustained.

It will be observed that specific kinds of business are not enumerated in the law and it is claimed by the state that insurance is included in "trade," "commerce" and "commodity," mentioned in the law. The problem to be solved is whether these terms, or any of them, by proper definition and by rightful construction of the law, include insurance.

Recourse to the definitions of lexicographers and of courts becomes necessary. Webster defines trade as follows:

1. The act or business of exchanging commodites by barter, the business of buying or selling for money.

2. The business which a person has learned and which he carries on for procuring subsistence or for profit, occupation, especially mechanical employment.

3. Business pursued, occupation, employment.

The definitions found in the Standard and Century Dictionaries are substantially the same. Bouvier says:

"*Trade.* In exemption laws it is usually confined to the occupation of a mechanic, but in its broader sense it is generally construed as equivalent to any occupation, employment, handicraft or business."

Anderson's Law Dictionary says:

"Trade, generally, equivalent to occupation, employment, or business whether manual or mercantile; any occupation, employment or business carried on for profit, gain or livelihood, not in the liberal arts or learned professions."

"The word 'trade' includes not only the business of exchanging commodities by barter, but the business of buying and selling for money, or commerce and traffic generally." *May* v. *Sloan,* 101 U. S., 231.

Story, J., said in *The Nymph,* 1 Sumn., 517:

"Wherever any occupation, employment, or business is carried on for the purpose of profit or gain, or a livelihood, not

in the liberal arts or in the learned professions, it is constantly called a trade.''

In this broader sense the word is used in *The Eliza,* 2 Gall., 4; *United States* v. *Brig Eliza,* 11 U. S., 113.

The business of a telegraph company was held to be a trade in 3 Exch. Div., 108.

In *Betz* v. *Maier,* 12 Tex. Civ. App., 219 (33 S. W. Rep., 710), it is said:

''The word 'trade' embraces within its meaning commercial traffic, and it also has a limited and restricted significance, which applies to mechanical pursuits; but, in its broad and general sense it covers and embraces all occupations in business, with the possible exception of the learned professions, and those that pertain to liberal arts and the pursuit of agriculture.''

In this case it was held that the business of an insurance agent was included in the term ''trade.''

The word or term ''commodity'' is defined by Webster as, 1. Convenience; accommodation; profit; advantage; interest. 2. That which affords ease, covenience or advantage, especially in commerce, including everything that is bought and sold, goods, wares, merchandise.

In the Century Dictionary: 1. Accommodation; convenience; suitableness. 2. Profit; advantage; interest. 3. That which is useful; anything that is useful, convenient or serviceable.

The definition in the Standard Dictionary is substantially the same.

Anderson's Law Dictionary, in addition to the definitions given, says that, ''Commodity is a general term and includes the privilege and convenience of transacting a particular business.''

8 Cyc., page 338. ''Commodity. In its primary and most comprehensive sense, accomodation; advantage; benefit; commerce [convenience]; commodiousness; convenience; gain; interest; privilege profit; the privilege and convenience of transacting a particular business. In its secondary and commercial sense, that which affords advantage or profit; that which affords convenience or advantage, especially in commerce, including everything movable which is bought and sold; an article of trade or commerce, a movable article of value, something that is bought and sold; any movable and tangible thing that is

ordinarily produced or used as the subject of barter or sale; anything movable that is subject of trade or acquisition; articles of any kind; property; something produced for use, and an article of trade or commerce."

"In the general sense a commodity is something of convenience, advantage, benefit, or profit; and in a special sense a commodity is something produced for use as an article of trade or commerce. * * * The privilege of transmitting or receiving, by will or descent, property on the death of the owner is a 'commodity' within the meaning of this word in the Constitution of Massachusetts." *Minot* v. *Winthrop*, 162 Mass., 110 (38 N. E. Rep., 512).

"Commodity is a general term and includes the privilege and convenience of transacting a particular business." *Commowealth* v. *Bank*, 123 Mass., 493.

"The primary meaning of the word commodity according to the lexicographers, is convenience, and its secondary meaning is that which affords convenience or advantage, especially in commerce, including everything which is bought and sold." *McKeon* v. *Wolf*, 77 Ill. App., 325.

"If regarded as meaning goods and wares only, there would be much difficulty in the case, but if it signifies 'convenience, privilege, profits, and gains,' as uniformly held by the state court, then all difficulty vanishes, and the case is clear." *Hamilton Mfg. Co* v. *Massachusetts*, 73 U. S., 632.

"Commodity is a general term and includes the privilege and convenience of transacting a particular business." *Portland Bank* v. *Apthorp*, 12 Mass., 252, 256.

Commerce is defined by Webster as being: "The exchange of merchandise on a large scale between different places or communities."

Anderson's Law Dictionary quotes from *Gibbons* v. *Ogden*, 22 U. S., 1, as follows:

"In its simplest signification an exchange of goods; but in the advancement of society, labor, transportation, intelligence, care, and various mediums of exchange become commodities and enter into commerce. A term of the wildest comprehending intercourse for the purpose of trade in any and all its forms."

It was said by Marshall, C. J., in *Gibbons v. Ogden, supra:*

"Commerce, undoubtedly, is traffic, but it is something more; it is intercourse. It describes the commercial intercourse be-

tween nations and parts of nations, in all its branches, and is regulated by prescribing rules for carrying on that intercourse.''

In this case it was held that commerce included navigation

In *Leloup* v. *Mobile,* 127 U. S., 640, it is held that communication by telegraph is commerce.

In Black's Law Dictionary, it is said to the effect that commerce includes the various agreements which have for their object, facilitating the exchange of the products of the earth or the industry of man, with an intent to realize a profit.

From the recognized and well settled definitions and meanings of the words ''trade,'' ''commodity'' and ''commerce'' as given by lexicographers, as established by courts and sanctioned and approved by long and general usage, it follows that these words could properly have been used in a sense broad enough to include fire insurance, by the Legislature, in the law under consideration, and that the words are susceptible of such defiition as will include and cover fire insurance.

The question now for determination is whether these words were used by the Legislature in such broad and general sense under such circumstances, and with such other language in the act as requires or justifies a construction of the act, given to these words a meaning which includes fire insurance.  Rules should be considered for the construing of the statute and to determine what should be considered in so doing.

''The intention of the lawmakers may be collected from the cause, or necessity of the act. * * * Every statute should be construed with a reference to its object, and the will of the lawmakers is best promoted by such a construction as secures that object, and excludes every other. * * * It being the duty of courts to give such a construction to statutes as will suppress the mischief, and advance the remedy.''  *Burgett* v. *Burgett,* 1 Ohio, 469, 482.

''In giving a construction to any statute, the court must consider its policy, and give it such interpretation as may appear best calculated to advance its object by effecting the design of the Legislature.  The great object of the statute in question is clearly expressed in the title prefixed to it.''  *Wilber* v. *Paine,* 1 Ohio, 248-255.

''It is a rule of interpretation universally accepted, that in giving a construction to the statute a court will consider its

policy and the mischief to be remedied, and give it such an interpretation as appears best calculated to advance its object by effectuating the design of the Legislature. * * * It is equally well settled that where the Legislature has employed explicit and unambiguous terms to express its purpose and object, the ordinary meaning of such terms is to be adopted." *Davis* v. *Justice,* 31 Ohio St., 359, 367.

"It is a fundamental rule of construction, that the language of a statute is to be interpreted according to the sense in which the terms are employed and the plain intention of the Legislature. The great object of the rules and maxims of interpretation has been to discover the true intention of the law. * * * Regard must be had to the real object of the law, and the effect and substance of the subject-matter, and not barely to the nicety of form or circumstance. The reason, intent, and spirit of a law, therefore, must often prevail over the literal import of the terms employed." *Slater* v. *Cave,* 3 Ohio St., 80, 82.

"While, on the one hand, the judiciary should be careful not to make its office of expounding statutes a cloak for the exercise of legislative power, on the other hand it is equally bound not to stick in the mere letter of a law, but rather to seek for its reason and spirit in the mischief that required a remedy and the general scope of the legislation designed to effect it." *Tracy* v. *Card,* 2 Ohio St., 431.

"In construing statutes so as to give them the legislative intent, interpretation may expand their meaning beyond the literal significance of the words. In each case regard must be had to the subject and the circumstances, as well as to the words used." *Cincinnati Gas Light and Coke Co.* v. *Avondale,* 43 Ohio St., 257, 267.

"The object of judicial investigation in the construction of a statute is to ascertain and give effect to the intent of the law-making body which enacted it. And where its provisions are ambiguous and its meaning doubtful, the history of legislation on the subject, and the consequences of a liberal interpretation of the language may be considered; punctuation may be changed or disregarded; words transposed, or those necessary to a clear understanding and, as shown by the context manifestly intended, inserted.

"But the intent of the lawmakers is to be sought first of all in the language employed, and if the words be free from ambiguity and doubt, and express plainly, clearly and distinctly the sense of the lawmaking body, there is no occasion to resort to other means of interpretation." *Slingluff* v. *Weaver,* 66 Ohio St., 621.

"When the real design of a Legislature in ordaining a statute, although it be not precisely expressed, is yet plainly perceivable, or ascertained with reasonable certainty, the language of the statute must be given such a construction as will carry that design into effect, even though in so doing the exact letter of the law be sacrificed, or although the construction be, indeed, contrary to the latter." *Logan Nat. Gas & Fuel Co.* v. *Chillicothe*, 65 Ohio St., 186, 206.

Rules applying directly to criminal cases will now be cited. In *Woodworth* v. *State*, 26 Ohio St., 196, 198, which was a case from this county, the Supreme Court said:

"The rule requiring the strict construction of a penal statute, as against the prisoner, is not violated by giving every word of the statute its full meaning, unless restrained by the context. * * * It is not intended, however, to ignore the rule which requires penal statutes, as against the prisoner, to be construed strictly, and in his favor, liberally. But it does prevent a construction, as against him, so strict, or, in his favor, so liberal, as to defeat the obvious intention of the Legislature."

Again, in *Barker* v. *State*, 69 Ohio St., 68, 74, it is said:

"We are quite aware that the rule of law and of this court is that a statute defining an offense is not to be extended by construction to persons not within its descriptive terms, yet it is just as well settled that penal provisions are to be fairly construed according to the expressed legislative intent, and mere verbal nicety, or forced construction, is not to be resorted to in order to exonerate persons plainly within the terms of the statute."

The meaning of the words of the statute being doubtful and its provisions subject to ambiguity, it becomes a duty under the authorities cited to consider "the history of the legislation," "the cause or necessity of the act," "the object and will of the lawmakers," and what "appears best calculated to best advance its object."

This act was passed April 19, 1898, at a time when the great industrial and commercial interests of the country were being concentrated and united under single control; when syndicates and trusts were being formed to control, not only production, but transportation; when competition was being stifled, and the result of individual effort was failure. The necessities of life

were passing under the control of monopolies and the condition of the masses was becoming subject to the power of combined wealth. Widespread apprehension existed in the minds of the people as to the result of these conditions, and the efforts of well meaning legislators were being directed to the remedy of evil conditions, and the protection of the people. National legislation had resulted in the Sherman law, and various states had enacted anti-trust laws; the object of all which was to protect the people from unjust monopoly, and to promote free competition.

Insurance had become and was generally recognized as a necessity. As pertinently remarked by counsel for the defendants, "Its great growth has been within the last half century." The home of the poor man and the business investments of the rich are not safe without it. Business would not prosper except for its protection. Credit, perhaps the greatest factor of the various enterprises of civilized life, is dependent upon it. It has become and is universally recognized as a necessity of life, progress and prosperity. From its nature, its business is transacted by comparatively few companies of great wealth, and thus its becoming a trust, as defined by the statute, was of comparatively easy accomplishment, and the danger to be apprehended correspondingly great.

Considering the "history of legislation" and the "necessity of the act," it seems incredible that the Legislature in adopting this law should have considered and intended only to include and provide against restrictions in trade or commerce, and the control of the price or production of commodities in the narrow and restricted sense of articles of trade and barter of goods, wares and merchandise.

Is it reasonable that the Legislature intended to prevent monopoly in practically all classes of business except fire insurance? Did it intend to give to that business a special privilege and immunity?

It is not to be presumed that favoritism was intended. The title of the act, which is declaratory of its object, says that it is "to promote free competition in commerce and all classes of business in the state." That fire insurance is a business will not be seriously contended.

To what extent may the title of the act be considered for a construction of the act?

Section 16, Article II of the Constitution of the state of Ohio, provides that "No bill shall contain more than one subject, which shall be clearly expressed in its title."

"It (the title) is one of the indices pointing, feebly it may be, to the legislative intent." *State* v. *Pugh*, 43 Ohio St., 98. It follows that to the full extent that we may rely upon the title of this act to determine its meaning, it must be said that it was intended to and does include insurance.

"The title is framed in the same manner as the bill, and is sanctioned by the vote of both branches of the Legislature; we may therefore consider it as explanatory of the object of the law." *Burgett* v. *Burgett*, 1 Ohio, 469-480.

"In trying to determine what the object of the words of a statute are, we are authorized to look at its title." *Bronson* v. *Oberlin*, 41 Ohio St., 476, 483.

It was held by the Supreme Court of Mississippi, in *American Fire Insurance Co* v. *State*, 75 Miss., 24 (22 So. Rep., 99), that a statute providing against combinations "of business" in those words, included fire insurance.

It is said, *Pinkney, In re*, 47 Kan., 89 (27 Pac. Rep., 179):

"The question presented· is, does the word 'trade,' used in the title, fairly indicate and include the provisions of the act with reference to insurance? It is argued that the usual meaning of the word should govern, and in that sense it has reference to the business of selling or exchanging some tangible substance or commodity for money, or the business of dealing by way of sale or exchange in commodities; and it is said that the use of the word in connection with that of 'products,' in the title qualifies the meaning of 'trade,' and makes it all the more apparent that the construction contended for is the correct one. This is the commercial sense of the word, and possibly may be the most common signification given to it; but it is not the only one, nor the most comprehensive meaning in which the word is properly used. In the broader sense, it is any occupation or business carried on for subsistence or profit. * * * The broader signification given to the word by most of the lexicographers would fairly embrace and cover the provision of the act with reference to the business of insurance. The title prefixed to an act may be broad and general, or it may be narrow and restricted, but in either event it must be a fair index of the provisions of the act; that is, the subject of the act must be clearly expressed by the title."

In *State* v. *Phipps*, 50 Kan., 609 (31 Pac. Rep., 1097), it was again held that insurance comes within the purview of "trade."

The statute of Iowa provided against combinations "to regulate or fix the price of oil, lumber, coal, flour, provisions or any other commodity or article whatever," and the Supreme Court of Iowa in *Beechley* v. *Mulville*, 102 Iowa, 602 (70 N. W. Rep., 107), held that "insurance companies and a compact to charge uniform rates" was included in "any other commodity." The court said:

"It is thought by appellants that such statute has no application to insurance companies, but the only reason assigned for it is that the same subject has been before each successive Legislature since the act passed, and no one has thought that the act referred to such companies. However that may be, we have no doubt of its application to insurance companies because of the language of the act. There is a manifest purpose to make the section comprehensive as to the subject-matter, as well as to persons, both natural and artificial, coming within its prohibitions. It prohibits combinations to fix the price of oil, lumber, coal, grain, flour, provisions, or any other commodity or article. whatever. Insurance is a commodity. 'Commodity' is defined to be that which affords advantage or profit. Mr. Anderson, in his Law Dictionary, defines the word as 'convenience, privilege, profit, gain; popularly, goods, wares, merchandise.' We see no reason why, in the act, the word should be restricted to its popular use. It is common to speak of 'selling insurance.' It is a term used in insurance business, and law writers have, to quite an extent, adopted it. Again, there are the same reasons why it should be protected against combinations as there are in matters clearly within the provisions of the law. The district court instructed the jury that the combination was prohibited by the act in question, and we think the holding was right."

In the case of *Metzger* v. *Adams*, 28 Ins. L. Jo., 176 (Ind.), it is said:

"No good reason has been given that will hold insurance exceptional, and accord to it a support that is denied to every other branch of industry. Business and law regard insurance as a commodity on the market, to be purchased as any other property, or beneficial interest."

Revised Statutes, 6969, and *Doll* v. *State*, 45 Ohio St., 445, 446, construing that section, speak of purchasing fire insurance.

In *Paul* v. *Virginia*, 75 U. S., 168, the restricted definition of commerce was applied to insurance and insurance contracts were

said not to be commodities to be shipped from one state to another.

This decision was followed in several others in the same court, but the subject under consideration was interstate commerce, and insurance has been frequently held not subject thereto.

It may be proper to remark that this rule was laid down many years ago, and insurance occupies a much more important position than then, and there has been much recent discussion to the effect that insurance should now be subject to interstate commerce.

In 1889 the state of Texas enacted what was perhaps the first anti-trust law of the states. In 1893 the Supreme Court of Texas in *Queen Ins. Co.* v. *State*, 86 Tex., 250 (24 S. W. Rep., 397), held that the law did not apply to insurance. In 1895 the Legislature of Texas enacted a second anti-trust law broadening its terms apparently for the purpose of including therein the subject of insurance.

The argument of counsel for the defendants is largely an effort to show that the Legislature of Ohio at the time of the passage of the law under consideration had before it the original Texas law, the decision of the Texas court and the amended Texas law, and that a comparison of the three laws indicates that our Legislature followed the original Texas law. That by a rule of construction recognized in Ohio, when the Legislature of our state adopts legislation from another state, which has been construed by a court of last resort in that state, there is a presumption (not conclusive however), that it does so with the construction that has been so given it.

Taking into consideration the evils productive of the law, the purpose of suppressing the mischief and of advancing the remedy, in connection with the suggestion that the Legislature had its attention directly called to the subject of insurance, by considering the first Texas law from which it was omitted, the Texas decision so holding and the second law so drafted as to include insurance, it seems to be extremely improbable that the Ohio Legislature should have purposely followed a statute which excluded insurance and which had been found deficient as shown by the subsequent legislation in the pioneer state of anti-trust laws. With due deference to the careful analysis and compari-

son of these laws by counsel for the defendants, in arguing that original Texas law was followed, it is not thought that the comparison warrants this conclusion.

The original Texas law in section one, subdivision first, read as follows: "To create or carry out restrictions in trade." This was amended so as to include insurance, and to read, "To create or carry out restrictions in trade or commerce, or aids to commerce, or to create or carry out restrictions in the full and free pursuit of any business authorized or permitted by the laws of the state."

It was held in *Queen Ins. Co.* v. *State, supra,* "that the words in the first subdivision of section one, of the act, 'to create or carry out restrictions in trade,' were intended only as a general expression of the purpose of the law." This is the subdivision changed to include insurance and in our statute the words, "all classes of business," were inserted in the title as expressive of the purpose of the law.

In the Ohio statute, subdivision one, of section one, is constituted a separate offense, as held in *State* v. *Gage,* 72 Ohio St., 210. This suggests the thought that our Legislature intended to include insurance, and the words bringing it in, as found in the Texas act, being where the court said was expressive of the purpose of the law, prompted their insertion in a corresponding place in the Ohio law, viz., the title.

It is said in a Texas decision:

"It is true that while trusts are defined in the first section, nowhere either in that or any other section are they expressly declared unlawful.  *  *  *  There is no express declaration that trusts are unlawful—the acts which are declared to constitute a trust are not expressly made punishable, nor is any act expressly declared to be a violation of the provisions of the statute."

That the Ohio law had before it the Texas decision and intended to remedy the defect suggested, and not to follow the original act, is apparent from the insertion in the Ohio law, in section one, subdivision five, the following provision: "Every such trust as defined herein is declared to be unlawful, against public policy and void.

Subdivision first, section one, Texas act of 1889, reads, "To create or carry out restrictions in trade." In the Texas act of

1895, to these words "or commerce" is added, and they are also found in section one, subdivision one of the Ohio law, thus indicating that the second Texas law was followed.

It is said in *Bloom* v. *Richards,* 2 Ohio St., 387, 402, "It is a general presumption that every word in a statute was inserted for some purpose. Mere idle and useless repetitions of meaning are not to be supposed, if it can be fairly avoided." The insertion of the words "or commerce" after "trade" means something, and if "trade" be used in the narrow sense, then "commerce" should be accorded a more general definition, more in consonance with the meaning urged by counsel for the state. While it can be readily believed that the Legislature had before it both Texas acts, and that it drew for material from both, it is not apparent from comparison, that the Ohio law was taken from the original Texas law, with the intention of excluding insurance.

It is urged by counsel for the defendants that Rev. Stat. 3659. the anti-compact law, having been amended since the enacting of the Stewart-Valentine law, which is said not to include associations of agents, and not having had inserted therein provision such as is contended for in the Stewart-Valentine law, is reason to support the claim that the Legislature did not intend to include insurance. With as much reason it may be said that the Legislature understanding that insurance was in the Stewart-Valentine law, did not therefore perceive any reason for inserting it in the anti-compact law, when amended.

The decision in *Queen Ins. Co.* v. *State, supra,* was largely based upon the provisions of the penal code of Texas, which have no application in this state, it being provided in the penal code that no person shall be punished for an act which is not made a penal offense, and the fact has been heretofore mentioned that the original Texas act did not expressly declare trusts to be unlawful. That code also provides for a strict construction of penal laws.

Further, the Texas decision held that under the terms of the original act providing against restraints of trade, many contracts and conditions of business would be punishable which are proper and necessary in the affairs of life; that no distinction is made between what is reasonable and proper and what is

unreasonable and improper, which considerations seem to have largely influenced the court.

In *State* v. *Gage*, 72 Ohio St., 210, it was urged that the Stewart-Valentine law was void because its terms do not except from its prohibitions, contracts, acts and transactions which are protected by the Constitution; but the court held that the case offered no opportunity for the application of a rule that when an act contains an indivisible prohibition, whose terms include contracts which the Legislature is powerless to prohibit, the courts can not save the act by restricting the natural and obvious meaning of its terms. Thus it will be observed that the Supreme Court of Ohio and the Supreme Court of Texas construe this anti-trust legislation along widely diverging lines.

*Runk* v. *Cloud*, 8 N. P., 448, is cited as authority that insurance is not to be considered in the act and the court in that case so held. In so deciding the court assumes that the statute is "a literal copy" of the Texas act, which counsel for defendants do not claim it to be, and then the court proceeds to adopt the argument of the Texas court. If it be not true that our statute was borrowed from the Texas act of 1889, then the foundation on which the case of *Runk* v. *Cloud, supra,* rests is destroyed. In this decision it is said: "Our Legislature very evidently then to avoid this ambiguity in our statute added on the word 'commerce,' to trade, as a synonym or equivalent and not by way of contrast." This is a plain violation of the rule of construction laid down in *Bloom* v. *Richards,* 2 Ohio St., 387, 402, that, "It is a general presumption that every word in a statute was inserted for some purpose."

This discussion further argues that all classes of business should be constructed to mean all classes of business devoted to commerce, otherwise it is said if it is given a larger signification "embracing everything about which a person can be employed" it will include classes of unions and combinations recognized to be lawful, devoted to working men.

*State* v. *Gage, supra,* held that lawful business can be excluded from the act and it still remain constitutional and operative. The decision seems to have been framed to avoid a danger said by our Supreme Court not to exist.

The effort of the court to restrict the meaning of "all classes of business" to the same class as commerce, by an application of the rule *ejusdem generis,* that when general words follow an enumeration of particular cases, such general words are held to apply to cases of the same kind as those which are expressly mentioned, is not warranted. It is generally held to be the law, that this rule does not apply when the particular precedent words exhaust a whole genus; in which case the general term is held to refer to a larger class. *McKeon* v. *Wolf,* 77 Ill. App., 325; 23 Am. & Eng. Enc. of Law (1st Ed.), 442; Sutherland, Stat. Constr., Sections 278-279; *Woodworth* v. *State,* 26 Ohio St., 196.

The word "commerce" is a generic word, the name of a whole class, and under the rule of the Illinois court and other authorities, " all classes of business" must be used in a more comprehensive sense.

It is held by the Supreme Court of Ohio, that "it is essential to validity of an act undertaking to regulate the business that it shall in its requirements operate equally"; and that, "Our Bill of Rights prohibits the granting of privileges to one which are denied to others of the same class, and the imposition of restrictions or burdens upon certain citizens from which others of the same class are exempt, and Sec. 26 of Art. II of the Constitution requires that all laws of a general nature shall have a uniform operation throughout the state." *State* v. *Gardner,* 58 Ohio St., 599.

The Stewart-Valentine law having been held valid in *State* v. *Gage, supra,* if the terms "trade," "commerce" and "commodity," properly defined, include insurance, then insurance must be held to be within the statute.

The Iowa case of *Beechley* v. *Mulville, supra,* which held that insurance is a commodity, is cited with evident approval by the Supreme Court of the United States in *Carroll* v. *Greenwich Ins. Co.,* decided November 27, 1905. In a concurring opinion by Justice Harlan in that case, he said:

"The business of fire insurance is of such a peculiar character, so intimately connected with the prosperity of the whole community, and so vital to the security of property owners, that it is competent for the state to forbid combinations and

agreements among fire insurance companies doing business within its limits, in reference to rates, agents, commissions and the manner of doing their business."

The fourth ground of the demurrer that intent is not alleged in the indictment, has not been argued, and it is understood that nothing is now claimed for it.

The issues presented by the demurrers have been considered in conjunction with Judge Metcalf, who concurs in the conclusions herein made, and in the finding that the demurrers should be overruled.

*C. L. Taylor* and *H. C. Starkey*, for plaintiff.

*T. E. Hoyt, A. M. Cox* and *H. B. Arnold*, for defendant.