UNITED STATES *v*. READING ET AL. (No. 540).[1]

FISH, NOT THE PRODUCTS OF AMERICAN FISHERIES.

The American fishing vessel took no part in the fishing operations in question here except to convey from the United States to Newfoundland certain fishing supplies. A portion of the fishing tackle so conveyed was used under the supervision and by employees of an American citizen temporarily at Bonne Bay, Newfoundland; but the fishermen engaged there for service apparently used their own boats and presumably obtained there their supplies. The fish so caught were cured on British soil and shipped to the United States in a British vessel: *Held*, the importation was not entitled to free entry as the product of American fisheries under paragraph 567, tariff act of 1909.

United States Court of Customs Appeals, April 17, 1911.

APPEAL from a decision of the Board of United States General Appraisers, G. A. 7121
(T. D. 31028).
[Reversed.]

*D. Frank Lloyd*, Assistant Attorney General (*Edwin L. Wakefield* on the brief), for the United States.
No appearance for the appellees.

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

MONTGOMERY, Presiding Judge, delivered the opinion of the court:
This is an appeal from the decision of the Board of General Appraisers which sustained the protest of the importer and held that certain fish entered by the importer were entitled to free entry as

---

[1] Reported in T. D. 31534 (20 Treas. Dec., 831).

the product of American fisheries under paragraph 567 of the tariff act of 1909. That paragraph places on the free list—

Fish, fresh, frozen, or packed in ice, caught in the Great Lakes or other fresh waters by citizens of the United States, and all other fish, the products of American fisheries.

The fish which were the subject of the present importation were caught in the waters within the district within which the liberty to take fish and to occupy and use the bays and harbors, in common with the subjects of His Britannic Majesty, in the drying and curing of same in any of the unsettled bays, harbors, and creeks of the southern part of the coast of Newfoundland and of the coast of Labrador, was granted by the treaty of 1818 between this country and Great Britain.

The record in the case shows that one Capt. Carter is the owner of the vessel *Sarah C. Wharf*, an American chartered tug fitted out for fishing; that she left Boston in 1907 and remained in the treaty boundaries of Newfoundland until 1909, at the time when these fish were caught; that Capt. Carter was there during the period and the business in question was conducted under his supervision. The fish covered by the present importation were caught in Rocky Harbor and cured on the shores of Bonne Bay, which adjoined. When the tug went north in 1907, she took with her $800 to $1,000 worth of trawl lines, nets for bait, hand lines, and hooks. At the time these fish were caught, the boat was not at Bonne Bay, but was some 30 miles distant in charge of an American captain with a crew partly American. How engaged at the time the fish in question were caught the record does not disclose. It would seem, therefore, that the connection of the boat with the case was not other than its use for the transportation of the fishing gear from Boston to Bonne Bay.

Capt. Carter testified that he employed residents of Newfoundland to catch the fish in question; that in some cases he furnished trawl lines and hand lines that were used by the men; that he paid them according to the catch, generally so much per pound; that he then hired them, giving them so much for curing them, and in some cases paid them by the day or by the hour to help in curing the fish; that the men, while so employed, were working exclusively for him and that he was bound by his contract to take all the fish they caught, and did so in the present case. The question presented is whether these facts constituted the enterprise an American fishery within the meaning of the tariff act.

The history of the industry shows that a somewhat liberal construction has usually been given to this provision. In December, 1886, the question was presented whether a cargo which had been taken by the crew of the vessel with the assistance of men and nets hired in Newfoundland for that purpose would be free of duty. The Secretary of the Treasury instructed the collector that such

fish, having been taken by an American vessel licensed for the fisheries, was entitled to free duty as the product of American fisheries. (T. D. 7933.)

In 1894 the question was presented as to whether fish caught off the banks of Newfoundland and purchased from traps, nets, or otherwise to make a cargo of an American fishing vessel, were the products of an American fishery. This question was answered in the negative. (T. D. 15479.)

In T. D. 28768 it appeared that the schooner *Bohemia* sailed from Gloucester on August 29, 1897, on a fishing trip with 11 men, all told; that upon arrival at Bonne Bay the master of the vessel engaged 20 men to fish for him, paying them at the rate of 1½ cents per pound for all fish caught by them; that such fish were delivered from the boats to the vessel and dressed on board the *Bohemia* by her regular crew.

In holding that these fish were the products of an American fishery, the Secretary said:

The department has frequently held that fish taken by an American vessel on the coast of Newfoundland "with the assistance of men, boats, and gear hired for the purpose," are free of duty as a product of American fisheries.

And added:

While said fish were paid for at the rate of 1½ cents per pound, it appears that it is the general practice of fishing vessels to pay for fish caught for them at a rate per pound, and as said fish were caught after the arrival of the *Bohemia* on the fishing grounds and expressly for that vessel, and were loaded directly aboard the vessel from the boats without having been landed ashore, the department is of the opinion that the same should be considered as having been caught by said vessel with the assistance of men, boats, and gear hired for the purpose and not as having been purchased.—T. D. 28768, citing the case of schooner *Whuland*, G. A. 5453 (T. D. 24738).

The Government contends that when fish are taken by foreign fishermen and subsequently purchased by an American citizen, or when fish caught by foreign fishermen hired by an American citizen, are taken from the fishing ground to a foreign shore and there dressed, frozen, salted, dried, or otherwise preserved for transportation, they are not entitled to free entry notwithstanding they are caught by an American, even though the owner of an American vessel conducts the enterprise, where, as appears in the present case, the vessel had no part in the fishing operations.

The Treasury Department, in a circular letter to the collectors of customs, signed by the Secretary of the Treasury, on January 17, 1911, defined an American fishery within the meaning of this paragraph to be a fishery operated under the American flag by American vessels in foreign waters in which such vessels have a right by treaty or otherwise to take fish and other marine products.

We have been cited to no case decided by the courts and to no construction by the department which holds that such an operation as

the present would fall within the language of the clause of the statute under consideration. It can not be said that all fish taken in the waters covered by the treaty between Great Britain and the United States are fish taken from an American fishery. The term "fishery" sometimes means the locus or the easement belonging to the riparian proprietor. Manifestly the term is not so used in the present tariff act. It has been extended to mean any enterprise conducted by an American fishing vessel flying the American flag, manned by American sailors, and in such case it has been held that fish caught by men not American citizens, hired for that purpose by the master of the vessel, are still the product of an American fishery.

This, it seems to us, is going quite as far as either the department or the courts can safely go. In the present case, as we have seen, the fishing vessel, which happened to be the property of Capt. Carter, engaged at Bonne Bay, had no part whatever in the actual operations involved in the taking of the fish which were the subject of this controversy. All that we have is the fact that the fish were caught under the supervision and by employees of an American citizen, temporarily at Bonne Bay, and that a portion of the fishing tackle was furnished by him. So far as the record indicates the boats employed by the fishermen were their own boats. The supplies furnished were presumably secured at Bonne Bay. Nothing to the contrary is shown. The fish were cured on British soil, and were shipped by a British vessel. And to hold that they are the product of an American fishery would result in permitting any American to go to British territory, prosecute his calling wholly through British employees, using British supplies, and bring himself within the clause of this statute permitting free entry. We think such was not the intent of Congress, and it follows that the decision of the Board of General Appraisers permitting free entry of these shipments must be *reversed*.

SMITH, BARBER, DE VRIES, and MARTIN, Judges, concur.