May Co. *v.* United States (No. 2277).[1]

1. Construction, Emergency Act—Retroaction.

The emergency tariff act of 1921 was not a displacement or repeal, but an *amendment* of the tariff act of 1913, and became a *part* of it. Hence, to apply the provisions of the emergency act to goods brought into the country before, but in bond at the time of, its institution would not contravene the familiar rule that laws are not to be given a retroactive effect unless such a legislative intention clearly appears.

2. Construction, Paragraph Q, Tariff Act of 1913, and Sections 301, 302, and 303, Emergency Tariff Act of 1921—Appraisement.

With reference to goods in bond at the time of the institution of the emergency tariff act of 1921, there is nothing in paragraph Q, tariff act of 1913, to prevent the application of sections 301, 302, and 303 of the emergency act, prescribing that appraisement must be made at the home-market value or the export value, whichever is higher.

[1] T. D. 40270

United States Court of Customs Appeals, June 9, 1924.

APPEAL from Board of United States General Appraisers, G. A. 8633 (T. D. 39594).

[Affirmed.]

*Barnes, Chilvers & Halstead* (*Frank M. Halstead* of counsel) for appellant.
*William W. Hoppin*, Assistant Attorney General (*William H. Futrell*, special attorney, of counsel), for the United States.

[Oral argument December 14, 1923, by Mr. Halstead and Mr. Hoppin.]

Before MARTIN, Presiding Judge, and SMITH, BARBER, and BLAND, Associate Judges; HATFIELD, Associate Judge, participating in the decision by agreement of counsel.

BLAND, Judge, delivered the opinion of the court:

Certain merchandise was shipped from Germany on April 26, 1921. It arrived in Baltimore on May 23, 1921; was entered for immediate transportation in bond to Cleveland, Ohio. It was there entered for consumption and delivery from customs custody on June 1, 1921. The emergency tariff act was passed on May 27, 1921; the merchandise was entered at the home consumption value, which was the market value as defined by the act of 1913. The goods were appraised at their export value under the provisions of sections 301, 302, and 303 of the emergency tariff act of May 27, 1921. On reappraisement the importer insisted that the goods should be appraised under the statute in force at the time the goods arrived at Baltimore. The single general appraiser sustained the entered value. The collector appealed and the board of three general appraisers sitting in reappraisement sustained the appraised value. The importer protested against the liquidation and the assessment of increased and additional duties. The Board of General Appraisers overruled the protest, and from this decision the importer has taken an appeal to this court.

The decision of this case involves the consideration of paragraph Q of section 4 of the tariff act of 1913, and of sections 301, 302, and 303 of the emergency tariff act of 1921, which are in part as follows:

PAR. Q. That on and after the day when this act shall go into effect all goods, wares, and merchandise previously imported, for which no entry has been made, and all goods, wares, and merchandise previously entered without payment of duty and under bond for warehousing, transportation, or any other purpose, for which no permit of delivery to the importer or his agent has been issued, shall be subjected to the duties imposed by this act and to no other duty, upon the entry or the withdrawal thereof: * * *

SEC. 301. That whenever merchandise which is imported into the United States is subject to an ad valorem rate of duty or to a duty based upon or regulated in any manner by the value thereof, duty shall in no case be assessed on a value less than the export value of such merchandise.

SEC. 302. That for the purposes of this title the export value of imported merchandise shall be the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is sold or freely offered

for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States, less the amount, if any, included in such price, attributable to any additional costs, charges, and expenses, and United States import duties, incident to bringing the merchandise from the place of shipment in the country of exportation to the place of delivery in the United States, and plus, if not included in such price, the amount of any export tax imposed by the country of exportation on merchandise exported to the United States.

SEC. 303 (a). That wherever in Title I of this act, or in the tariff act of 1913, as amended, or in any law of the United States in existence at the time of the enactment of this act relative to the appraisement of imported merchandise (except sections 2874, 2976, and 3016 of the Revised Statutes, and section 801 of the revenue act of 1916), reference is made to the value of imported merchandise (irrespective of the particular phraseology used and irrespective of whether or not such phraseology is limited or qualified by words referring to country or port of exportation or principal markets) such reference shall, in respect to all merchandise imported on or after this act takes effect, be construed to refer, except as provided in subdivision (b), to actual market value as defined by the law in existence at the time of the enactment of this act, or to export value as defined by section 302 of this act, whichever is higher.

The importer contends that prior to the appearance of paragraph Q in the act of 1913, and similar provisions in former tariff laws, merchandise was dutiable for all purposes under laws effective on the date of its importation, and that its importation was the date of its arrival within the limits of the customs collection district with intent to unlade, but that paragraph Q changed this rule laid down in the decisions of the courts to the extent that imported merchandise would be subject to the *rates* of duty prescribed by law on the date on which the importation is completed by the issuance of delivery permits. It is strongly urged by the importer that while under paragraph Q the *rate* of duty prescribed by the statutes in effect upon the date of issuance of delivery permits might be applicable to the merchandise in question, the provisions of law with reference to valuation were not changed by paragraph Q, and that the goods should have been appraised under the provisions of the act of 1913 (before the amendment of 1921 was made), which provided for taking the home consumption value on the date of the importation instead of the export value or market value, as provided for in section 303 of the act of 1921.

The following cases are cited by the importer to sustain its contention that goods are imported within the meaning of the sections of both acts above referred to upon the date of their arrival within the limits of the customs collection district with intent to unlade: Meredith & Elliott v. United States (38 U. S. 486); United States v. Vowell (9 U. S. [5 Cranch] 368); United States v. Lindley (26 Fed. 971); Arnold v. United States (13 U. S. [9 Cranch 104] 103; 3 Law. ed.

671, article 222, C. R. 1915). These decisions follow the general rule that laws are not to be given a retroactive effect unless they expressly so provide, and without discussing them separately we think it is sufficient to say that they establish the rule that the Government's right to duties begins when the goods arrive within the boundaries of the customs collection district with intent to unlade. This court, however, has held in cases very similar to the one at bar that goods are not imported until they have passed beyond the custody and control of the customs officials.—United States *v.* Cronkhite (9 Ct. Cust. Appls. 129; T. D. 37980); Five Per Cent cases (6 Ct. Cust. Appls. 291–320; T. D. 35508); Constance *v.* United States (11 Ct. Cust. Appls. 435; T. D. 39436).

In United States *v.* Cronkhite, supra, the court said:

Accordingly we must naturally assume that such merchandise would not be deemed by Congress to be "imported" within the language of the act until it had passed beyond the custody and control of the customs officials and into the custody and control of the importer, his agent, or consignee, thereby becoming a part of the body commerce of this country. * * * Five Per Cent cases (6 Ct. Cust. Appls 291; T. D. 35508). * * * So long as merchandise remains under bond for warehousing in the tariff sense and for assessment of duties its importation has not been completed. Indeed, it may never be completed; hence warehoused goods are for tariff purposes "future importations."

Judge Barber, in the very well considered Five Per Cent cases, supra, in giving the opinion of the court, said:

The purpose of the tariff laws, generally speaking, is to provide that the dutiable status of imported merchandise is to be determined at the time it enters into the commerce of the country. Clearly, with respect to the class of merchandise now under consideration, that time was when entry for consumption was made and delivery permits issued.—Marriott *v.* Brune (9 How. 50 U. S. 619), Fabbri *v.* Murphy (95 U. S. 191), Hartranft *v.* Oliver (125 U. S. 525), United States *v.* Burr (159 U. S. 78, 83–84), American Sugar Co. *v.* United States (202 U. S. 563), Franklin Sugar Co. *v.* United States (202 U. S. 580), Faber *v.* United States (221 U. S. 649), United States *v.* Goodsell (84 Fed. 439), Mosle *v.* Bidwell (130 Fed. 334), United States *v.* Hartwell (142 Fed. 334), American Cigar Co. *v.* United States (146 Fed. 484), Gump *v.* United States (3 Ct. Cust. Appls. 137; T. D. 32384).

Now, while J, subsection 7, without reference to subsections Q and S, relates to duties on merchandise *thereafterwards* imported, we think when taken together these provisions should be construed to include merchandise brought here before the passage of the act, under bond for warehousing, but which thereafter is entered for consumption. So long as merchandise remains under bond for warehousing in the tariff sense and for assessment of duties, its importation has not been completed. Indeed, it may never be completed; hence warehoused goods are for tariff purposes future importations. (See cases last above cited.)

It is contended by the importer that if the provisions of the act of 1921 with reference to appraisements are applied to the importation which they contend was made under the original act of 1913, it would be giving it a retroactive effect, and that legislation will not be

declared to be retroactive unless it in plain terms indicates that it is so intended. We can not agree with this contention of the importer. The act of 1921 is an amendment of the act of 1913. In the Constance case, supra, this court in construing paragraph Q held that the emergency act became a part of the tariff act of 1913. The court said:

> The emergency tariff act, as its name indicates, was an emergency measure and was designed not to supersede, but to suspend for six months certain provisions of the tariff act of 1913, during which period certain commodities were subjected to duties not imposed by the act of 1913. The emergency act became and during its life continued to be a part of the tariff act of 1913. Its emergency provisions while in force must, therefore, be regarded as suspending, modifying, and substituting, and to that extent amending, the corresponding provisions of the prior law. (P. 436.)

It seems clear that Congress intended all provisions of the act of 1921 with reference to appraisement to apply to just such importations as are under consideration in this case. A reading of sections 301, 302, and 303 would seem sufficient to compel the conviction that the Congress intended that goods brought to this country but which had not become a part of its commerce should not take the low home consumption value of the foreign country, but that because of the emergency the duties should be levied in accordance with new standards set out in the 1921 amendment of the old act. Section 303 requires that in determining value in connection with the appraisement of imported merchandise, the actual market value as defined by the law in existence at the time of the enactment of the act of 1921, or the export value as defined by section 302 of the act of 1921, should be taken, whichever is the higher. In other words, Congress. in the emergency intended to see to it that not only should certain rates of duty in existence be increased, and many free-list articles be put upon the dutiable list, but that in determining value for the levying of duties, the higher of two standards of value should be accepted, and that they intended, where the word "imported" was used in this connection, that it should not refer to goods which had crossed the customs line prior to making the amendment to the act of 1913, but which were on May 27, 1921, not released from customs custody.

The words "import" and "importation" may be used with entirely different meanings. In general, "import" means "to bring in" (Webster's New International Dictionary, 1910), and the words were given such meaning in the very recent case of Cunard Steamship Co. v. Mellon (262 U. S. 100), in which it was held at page 122 that:

> Importation, in a like sense, consists in bringing an article into a country from the outside. If there be an actual bringing in it is importation regardless of the mode in which it is effected. Entry through a customhouse is not of the essence of the act.

This reasoning was used in connection with liquor which was brought into the port of New York on foreign vessels, but not entered for customs duty. When Congress uses the words "import" and "importation" in a tariff act, it of course refers to the bringing in of goods under customs control. Also the word "import" sometimes is applied in tariff decisions to goods which were never entered, and which never became a part of our commerce, but which were under the control of customs officials. "Imports" is also very properly held to be only such goods as actually are released from customs custody into the commerce of the country. The circumstances of this case lead us to the irresistible conviction that where the word "imported" is used in sections 301, 302, and 303 of the act of 1921 it has a broader meaning than merely a "bringing in," and that it was meant to refer to the completed act, which was after the goods had been released from the customs control.

The appraised value was correct, and the judgment of the Board of General Appraisers is *affirmed.*

### DISSENTING OPINION BY SMITH, JUDGE.

I am sorry that I can not concur in the opinion of my esteemed associate, Judge Bland.

The importations involved in this appeal were shipped from Germany on April 26, 1921, and arrived in Baltimore on May 23, 1921, at which place they were entered for immediate transportation in bond to Cleveland, Ohio. They were entered for consumption on June 1, 1921, at their market value as prescribed by the tariff act of 1913. The goods were appraised at their *export value* under the provisions of sections 301 and 303 (*a*) of the emergency tariff act which was passed on May 27, 1921, and went into effect on May 28, 1921. The sections referred to, in so far as pertinent, read as follows:

SEC. 301. That whenever merchandise which is imported into the United States is subject to an ad valorem rate of duty or to a duty based upon or regulated in any manner by the value thereof, duty shall in no case be assessed on a value less than the export value of such merchandise.

    *        *        *        *        *        *        *

SEC. 303. (*a*) That wherever in Title I of this act, or in the tariff act of 1913, *as amended,* or in any law of the United States in existence at the time of the enactment of this act relative to the appraisement of imported merchandise * * * reference is made to the value of imported merchandise * * * such reference shall, in respect of all merchandise *imported on or after* the day this act takes effect, be construed to refer * * * to actual market value as defined by the law in existence at the time of the enactment of this act, or to export value as defined by section 302 of this act, whichever is higher. [Italics not quoted.]

The importer appealed to reappraisement on the ground that the appraisement should have been made as required by the act of 1913,

which was in full force at the time the goods arrived at Baltimore. The single general appraiser sustained the entered value, but on the collector's appeal from that decision the original appraisement made under the act of May 27, 1921, which became effective on May 28, was held to be valid by the Board of General Appraisers sitting in reappraisement.

The collector thereupon liquidated the entry and assessed the importer with *additional* duties because he had entered the importation at its market value as prescribed by the tariff act of 1913 instead of its value as prescribed by the act of May 27, 1921, which went into effect five days after the goods arrived at Baltimore.

The decision of Judge Bland holds without qualification that the phrase "merchandise which has been imported into the United States" covers only such merchandise as has actually entered the commerce of the country by its release from customs custody and that goods are not imported which have been simply carried across the customs line into the United States with the intention of there unlading them.

That definition is, as I see it, at odds with well-settled customs law and all of the decided cases as I understand them.

The common ordinary meaning of "import" is to bring merchandise from a foreign country or State into one's own country or State; introduce from abroad, especially commercially; opposed to export. (See "import" and "export"—Standard Dictionary.)

"An importation into the United States means not merely a bringing of goods within our jurisdictional limits but also a bringing of them into some port, harbor, or haven with an intent to land them there."—The *Mary* (16 Fed. Cas. 932, 933).

"Importation takes place when the vessel arrives at the port of entry intending there to discharge her cargo. Kidd *v.* Flagler (54 Fed. 367, 369), citing United States *v.* Vowell (5 Cranch 368); Arnold *v.* United States (9 Cranch 104, 108, 109). An importation is *complete* when goods are brought within the limits of a port of entry with the intention of unloading them there. Kohne *v.* Insurance Co. (1 Wash. C. C. 138, 165); United States *v.* Ten Thousand Cigars (2 Curt. 436, 437).

"There is no statute of the United States, nor any general principle of law, *which requires an entry to be made in order to render the importation complete*. The arrival of a vessel at her port of destination with intent to land her cargo constitutes an importation * * *. If an entry be necessary to complete the importation, still when the law permits it to be made it must relate back to the period of the arrival of the vessel at her port of destination."—Perots et al. *v.* United States (19 Fed. Cas. p. 258.)    (Italics not quoted.)

Every tariff act which has imposed a rate of duty on goods different from that which prevailed at the time they came into the country has recognized that they were imported when they crossed the customs line with intention to unlade and has simply provided that if merchandise *previously imported* was not entered prior to the going into effect of the new act, or if merchandise *previously entered* without payment of duty and under bond for warehousing, transportation, or any other purpose, for which no permit of delivery to the importer or his agent was issued, they should be subject to the duties imposed by the new act.

Section 33 of the act of 1897, section 29 of the act of 1909, and paragraph Q of the act of 1913, read as follows:

Act of 1897, section 33. That on and after the day when this act shall go into effect all goods, wares, and merchandise previously imported, for which no entry has been made, and all goods, wares, and merchandise previously entered without payment of duty and under bond for warehousing, transportation, or any other purpose, for which no permit of delivery to the importer or his agent has been issued, shall be subjected to the duties imposed by this act and to no other duty, upon the entry or the withdrawal thereof: *Provided,* That when duties are based upon the weight of merchandise deposited in any public or private bonded warehouse, said duties shall be levied and collected upon the weight of such merchandise at the time of its entry.

Act of 1909, section 29. That on and after the day when this act shall go into effect all goods, wares, and merchandise previously imported, for which no entry has been made, and all goods, wares, and merchandise previously entered without payment of duty and under bond for warehousing, transportation, or any other purpose, for which no permit of delivery to the importer or his agent has been issued shall be subjected to the duties imposed by this act and to no other duty, upon the entry or the withdrawal thereof: *Provided,* That when duties are based upon the weight of merchandise deposited in any public or private bonded warehouse, said duties shall be levied and collected upon the weight of such merchandise at the time of its entry.

Act of 1913, paragraph Q. That on and after the day when this act shall go into effect all goods, wares, and merchandise previously imported, for which no entry has been made, and all goods, wares, and merchandise previously entered without payment of duty and under bond for warehousing, transportation, or any other purpose, for which no permit of delivery to the importer or his agent has been issued, shall be subjected to the duties imposed by this act and to no other duty, upon the entry or the withdrawal thereof: *Provided,* That when duties are based upon the weight of merchandise deposited in any public or private bonded warehouse, said duties shall be levied and collected upon the weight of such merchandise at the time of its entry.

The language of all three provisions demonstrates to a conclusion that they were intended to apply to merchandise already imported and completely negatives the idea that merchandise is not imported until released from customs custody.

The goods here involved were carried across the customs line and actually landed at Baltimore not later than May 23, 1921, and

unless the long-established definition of "imported" be changed, there is no escaping the conclusion that they were imported into the United States prior to the going into effect of the emergency tariff act. If before that act took effect they were not entered or entered without payment of duty under bond for warehousing, transportation, or for any other purpose they became by virtue of paragraph Q subject to the *duties* but not to the appraisement provided by the emergency tariff act. Paragraph Q says nothing at all about the appraisement of importations, and without judicial legislation it can not be said that that paragraph or any other provision of law requires their appraisement as prescribed by the emergency tariff act.

Congress took special care to expressly provide in paragraph Q that the *weight* of the merchandise should be taken as of the *date of entry* and not having prescribed that the appraisement thereof should be made in accordance with the later legislative dispensation, it does not lie with the Judicial Department of the Government to add to the law a provision which Congress saw fit to omit. Indeed section 303 of the act of May 27 expressly declares that any reference in the act to the appraisement of merchandise shall be construed to refer to merchandise imported on and after the day the act went into effect.

No importer should be punished for entering his goods at the value prescribed by the law in force at the time of their importation, much less should he be mulcted in additional duties for not entering them at a value first made known to him by a law enacted after their importation and after their entry for warehousing or transportation in bond. Nevertheless, the prevailing opinion, without any express statutory mandate to that effect, firmly establishes a rule under which goods warehoused a year or two years before the emergency tariff act was passed must be assessed with additional duties if entered for warehouse at their market value under the act of 1913, instead of the higher export value prescribed by a subsequent legislative enactment of which the importer could have had no warning whatever at the time he made his entry.

This court only a few months ago emphatically declared that certain provisions of the act of 1922 manifestly designed for the *relief* of importers were not applicable to goods imported under the act of 1913 inasmuch as statutes must be regarded as prospective not retrospective unless the contrary appears.—Brown & Co. et al. *v.* United States (12 Ct. Cust. Appls. 207; T. D. 40026); Scaramelli *v.* United States (12 Ct. Cust. Appls. 134; T. D. 40056); Keve & Young *v.* United States (12 Ct. Cust. Appls. 103; T. D. 40027).

The rule adopted by those cases is modified by the decision in this case and is made inapplicable to goods in customs custody at the time the act of 1922 became effective. Moreover, if the act of 1922 must be denied a retroactive effect, by what process of reasoning

can a retroactive effect be accorded to the emergency act? The rule established by the majority opinion makes it imperative to appraise, under the act of 1922, goods which may have been imported and entered in bond or for warehouse long before that act was passed. Worse than that, it punishes the importer for doing that which the law in force when he made his entry required him to do and penalizes him for failing to declare a value which for customs purposes did not then exist.

The decisions relied upon by the majority of court were rendered *by virtue of paragraph Q*, and it can not be successfully contended that without that paragraph any duty could have been lawfully assessed on the goods there involved other than that in force on the date they were carried across the customs line with intent to unlade. None of the decisions cited is authority for the appraisement of goods at a value other than that prescribed by the law in force when they came into the country.

The judgment of the board should in my opinion be reversed.

BARBER, Judge, concurs in this dissent.