PROCTER & GAMBLE MANUFACTURING CO. *v.* UNITED STATES
(No. 3488) [1]

[1] T. D. 45578.

United States Court of Customs and Patent Appeals, March 30, 1932

*B. A. Levett* (*Frederic R. Coudert* of counsel) for appellant.
*Charles D. Lawrence*, Assistant Attorney General (*William H. Futrell*, special attorney, of counsel), for the United States.

[Oral argument February 11, 1932, by Mr. Coudert and Mr. Lawrence]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

GRAHAM, Presiding Judge, delivered the opinion of the court:

The whaling company Rosshavet of Sandefjord, Norway, entered into a contract at Bergen, Norway, on November 30, 1929, in and by which said contract the Rosshavet company sold a cargo of whale oil to appellant, the Procter & Gamble Manufacturing Co. of Cincinnati, Ohio. By the terms of the written contract between the parties, the oil was to be produced upon the floating ship factory, the *C. A. Larsen*, and was to be obtained during the season 1929 and 1930 from the Ross Sea in the Antarctic Ocean and that vicinity. The oil was estimated to arrive at an American port to be selected by the

buyer, approximately in April, May, or June of 1930. The prices of various grades of oil, as well as the terms and manner of payment, were fixed by the contract. The *C. A. Larsen* was a vessel sailing from a Norwegian port and under a Norwegian flag. She was outfitted in Norway, and her master and crew were, with a few exceptions in the crew, citizens of that country.

After the making of this contract, the *C. A. Larsen* proceeded to the Ross Sea and captured whales, from which were produced on board her 12,833½ tons of oil. All these operations were upon the high seas, the nearest land at any time being the Baleny Islands, 80 miles distant. The cargo being completed, the *C. A. Larsen* set sail for the United States. She stopped at Wellington, New Zealand, for supplies and fuel. At this place a bill of lading was made out. Proceeding, she stopped again at Panama for fuel and from thence sailed to New York, where her cargo was entered April 25, 1930.

The consular invoice was prepared and dated at Bergen, Norway, on March 11, 1930, by the representatives of the Rosshavet company, and was consulated by the consul of the United States at that place on March 21, 1930.

The goods were entered for warehouse under the Tariff Act of 1922 and were withdrawn for consumption under the Tariff Act of 1930.

The collector at the port originally classified the goods at 6 cents per gallon under paragraph 53 of the Tariff Act of 1922 and later reliquidated the same under paragraph 52 of the Tariff Act of 1930 at the same rate.

Said paragraphs are identical, in so far as the imported goods are concerned, and the material portions read—

Oils, * * * whale and seal, 6 cents per gallon.

The importer severally protested against the liquidation under the Tariff Act of 1922 and the reliquidation under the Tariff Act of 1930, upon the grounds that the goods were not dutiable under either act as not having been imported from any foreign country into the United States.

The United States Customs Court, Third Division, in a very well-considered decision by Evans, Judge, overruled the protests. The court was of the opinion that it plainly appears from the various statutory provisions relative to whale oil, appearing in the respective acts of 1922 and 1930, and the legislative history of the acts, that it was the legislative intent to impose a customs duty upon whale oil, the product of other than United States fisheries. The court was further of the opinion that merchant ships of a foreign country, such as the *C. A. Larsen*, were foreign territory, and that whale oil produced upon them is produced in a foreign country, within the meaning of the statute.

The appellant brings the case here on appeal. The able and distinguished counsel representing the appellant have argued here with great earnestness and much force that the first section of each of the acts in question here plainly states that duties—

shall be levied, collected, and paid upon all articles when imported from any foreign country into the United States;

that this language is plain and unambiguous, and that, therefore, we may not resort to rules of construction to vary its ordinary meaning; that a foreign country means, under the authorities, a place or territory within the jurisdiction of some foreign nation; that a merchant ship is not such a place or territory when upon the high seas, beyond the three-mile limit of the country whose flag it flies; that this whale oil, having been produced and manufactured upon the high seas, was never within a foreign country and, hence, could not be imported from such a country.

It must be conceded that the language of said section 1, "foreign country," if given its ordinary interpretation, means the territory of a nation alien to our own. Webster's New International Dictionary, 1932. Or, as was said in *De Lima* v. *Bidwell*, 182 U. S. 1, 180—

* * * A foreign country was defined by Mr. Chief Justice Marshall and Mr. Justice Story to be one exclusively within the sovereignty of a foreign nation, and without the sovereignty of the United States. *The Boat Eliza*, 2 Gall. 4; *Taber* v. *United States*, 1 Story, 1; *The Ship Adventure*, 1 Brock 235, 241. (Fed. Cas. 93.)

If this language were to be literally construed, therefore, goods that come from the high seas might seem not be be imported from a foreign country, for the high seas are the common property of all nations and the exclusive property of none. *The Ship Adventure, supra.*

It is a cardinal rule of statutory construction that if the language used by the legislative body in the act is so plain and unambiguous as to be readily understood, then there can be no reason or grounds for applying judicial rules of construction to ascertain its meaning. *United States* v. *Littwitz*, 18 C. C. P. A. (Customs) 341, T. D. 44588; *Maxwell* v. *Moore*, 22 How. 185; *Western Cartridge Co.* v. *du Pont*, 16 Ct. Cust. Appls. 229, T. D. 42839; *United States* v. *Innis, Speiden & Co.*, 7 Ct. Cust. Appls. 3, T. D. 30254; *Lake County* v. *Rollins*, 130 U. S. 662, 670; *United States* v. *Lexington Mill Co.*, 232 U. S. 399, 409; *Van Camp* v. *American Can Co.*, 278 U. S. 245, 253.

The master rule, in the consideration of all statutes, has been to so interpret them as to carry out the legislative intent. *Markell* v. *United States*, 16 Ct. Cust. Appls. 518, T. D. 43239; *United States* v. *Oregon, etc.*, 164 U. S. 526, 539; *Hawaii* v. *Mankichi*, 190 U. S. 197, 213; *United States* v. *Katz*, 271 U. S. 354.

Accordingly, we have held, and this has been the uniform holding of the courts, that if, from a consideration of the language of the statute under consideration, its context, and other statutes in *pari materia* therewith, it appears that a literal interpretation of the statute involved would produce a result contrary to . the apparent legislative intent, then the letter of the statute must yield and the legislative intent be carried out. *United States* v. *American Trad. Co.*, 17 C. C. P. A. (Customs) 368, T. D. 43810; *United States* v. *Int. Trad. Co.*, 15 Ct. Cust. Appls. 348, T. D. 42511; *Lehn & Fink* v. *United States*, 12 Ct. Cust. Appls. 359, T. D. 40519; *Cron & Dehn* v. *United States*, 18 C. C. P. A. (Customs) 445, T. D. 44699; *Hansen* v. *United States*, 1 Ct. Cust. Appls. 1, T. D. 30769; *Whitlock Cordage Co.* v. *United States*, 13 Ct. Cust. Appls. 656, T. D. 41490; *United States* v. *Cofod Co.*, 12 Ct. Cust. Appls. 539, T. D. 40736; *United States* v. *Stone & Downer*, 274 U. S. 225; *Holy Trinity Church* v. *United States*, 143 U. S. 457; *Taylor* v. *United States*, 3 How. 197, 210; *United States* v. *Goldenberg*, 168 U. S. 95, 103; *Robertson* v. *Salomon*, 130 U. S. 412; *United States* v. *Klumpp*, 169 U. S. 209.

Paragraph 1730 (a) of the free list of the Tariff Act of 1930 is as follows:

PAR. 1730. (a) All products of American fisheries (including fish, shellfish, and other marine animals, and spermaceti, whale, fish, and other marine animal oils), which have not been landed in a foreign country or which, if so landed, have been landed solely for transshipment without change in condition: *Provided*, That fish the product of American fisheries (except cod, haddock, hake, pollock, cusk, mackerel, and swordfish) landed in a foreign country and there not further advanced than beheaded, eviscerated, packed in ice, frozen, and with fins removed, shall be exempt from duty: *Provided further*, That products of American fisheries, prepared or preserved by an American fishery, on the treaty coasts of Newfoundland, Magdalen Islands, and Labrador, as such coasts are defined in the Convention of 1818 between the United States and Great Britain, shall be exempt from duty.

Paragraph 1630 of the free list of the Tariff Act of 1922 is as follows:

PAR. 1630. Oils, animal: Spermaceti, whale, and other fish oils of American fisheries, and all fish and other products of such fisheries; and all cod and cod-liver oil.

From a mere reading of these paragraphs, together with paragraphs 52 and 53 of the same acts hereinbefore quoted, which make whale oil dutiable, the conclusion is irresistible that whale oil brought into the commerce of the United States, unless the product of the fisheries of the United States, was intended to be dutiable. The term "fishery," as so employed, means any enterprise conducted by vessels flying the flag and manned by seamen of the United States. *United States* v. *Reading*, 1 Ct. Cust. Appls. 515, T. D. 31534.

If this were not true, there would be no purpose in exempting from customs duties whale oil produced by our fisheries, for all such oil would be nondutiable if produced upon the high seas. It is a matter of common knowledge that whales are captured and killed, to a large extent, upon the high seas, and not within the territorial limits of any country. Whale oil, if produced by fisheries of the United States, would be produced in floating factories upon the high seas or in factories within our territorial limits; if by the latter method, no exempting statute would be necessary, for there would be no imported goods. It is, therefore, in large part, whale oil produced upon the high seas to which the exempting statute must apply. It certainly could not be held to apply to whale oil produced in factories in foreign countries from whales procured by fisheries of the United States. That contingency has been carefully hedged about, to promote manufacture in the United States, by the explanatory language in said paragraph 1730 (a) relative to products of our fisheries landed in foreign countries. The same thought was in mind in *New England Fish Co.* v. *United States*, 15 Ct. Cust. Appls. 34, T. D. 42137, under the Tariff Act of 1922.

As this evident purpose, therefore, appears from the paragraphs quoted, we are justified in further examining the legislative history of these provisions to determine the legislative intent. We find that from a very early period in our national history, laws have been enacted by our Congress to impose customs duties upon imported whale oil and to exempt from such duties the products of the fisheries of the United States. Act of April 27, 1816, sec. 1, par. 6, 3 Stat. 311; act of August 30, 1842, sec. 8, par. 3, 5 Stat. 558; act of July 30, 1846, Schedule E, 9 Stat. 46; act of March 3, 1883, sec. 2503, 22 Stat. 514, 520; act of October 1, 1890, Schedule A, par. 46, 26 Stat. 568, and par. 661, free list, 26 Stat. 608; act of August 27, 1894, sec. 2, par. 568, free list, 28 Stat. 542; act of July 24, 1897, sec. 2, par. 626, free list, 30 Stat. 199; act of August 5, 1909, Schedule A, par. 40, 36 Stat. 14, and par. 639, free list, 36 Stat. 77; act of October 3, 1913, par. 561, free list, 38 Stat. 160.

The Summary of Tariff Information, 1920, page 736, furnished to the Committee on Ways and Means of the House of Representatives and before that committee when H. R. 7456, which afterwards became the Tariff Act of 1922, was being prepared, in referring to the dutiable status of whale oil under the tariff act of October 3, 1913, said—

Spermaceti, Whale and Other Fish Oils.

These fish oils are described and are dutiable under paragraph 44 when imported *from sources* other than American fisheries. (Italics ours.)

A somewhat similar reference is found in Summary of Tariff Information, 1921, pages 141–143, furnished to the Senate Finance Committee in consideration of the same bill.

While the bill which afterwards became the Tariff Act of 1930 was under consideration, the Summary of Tariff Information, 1929, furnished by the United States Tariff Commission, was before the committees having said bill in charge. In discussing what afterwards became said paragraphs 52 and 1730 (a) of said act, said summary states, pages 259, 260—

WHALE OIL

*Description and uses.*—Whale oil is made from the blubber and flesh of all species of whales except the sperm whale. Since 1922 more than 95 per cent of the whale oil consumed in the United States has been used in the manufacture of soap. About 75 per cent of the whale oil consumed in Europe is used in the manufacture of margarine, and the remainder in soap, candles, and greases.

*Production, domestic and foreign.*—In 1927 the world production of whale oil was approximately 458,000,000 pounds, about 60 per cent of which was produced from whales caught by Norwegian vessels, 25 per cent by vessels of the British Empire, 5 per cent by Spanish vessels, and 10 per cent by vessels of the United States, Canada, Japan, Argentina, and New Zealand. The United States production comes principally from the Pacific Ocean and the foreign principally from the Antarctic Ocean.

\*   \*   \*   \*   \*   \*   \*

*Imports.*—Imports come almost entirely from Norway and consist mainly of oil produced in the Antarctic fisheries. *At times large quantities are transported to the United States directly from the Antarctic fishing centers.* (Italics ours.)

It is quite apparent, therefore, from a consideration of the legislative policy of this country for over 100 years, and from the information which the Congress had, and in the light of which it acted, that it was intended by the Tariff Acts of 1922 and 1930 to make whale oil dutiable when it came from any other source than the fisheries of the United States.

This being true, does the language "from a foreign country," in said section 1, render it impossible to so construe the act as to carry out such plain legislative intent?

We do not think so. The strongest expression favorable to the literal construction of statutes called to our attention is that found in *Crooks* v. *Harrelson,* 282 U. S. 55, 60. Even in that case, however, the court announces the doctrine that if there be something which makes plain the intent that the letter of the statute is not to prevail, such intent will be the guide to construction.

There is no hard and fast definition for the term "foreign country," as it appears in the acts before us. Such meaning may be broad or narrow, as the apparent intent of the statute requires. Mr. Chief Justice Hughes, speaking for the court in the recent case of *Burnet* v. *Chicago Portrait Co.,* 285 U. S. 1, said—

The word "country," in the expression "foreign country," is ambiguous. It may be taken to mean foreign territory or a foreign government. In the sense of territory, it may embrace all the territory subject to a foreign sovereign power. When referring more particularly to a foreign government, it may describe a

foreign State in the international sense; that is, one that has the status of an international person with the rights and responsibilities under international law of a member of the family of nations; or it may mean a foreign government which has authority over a particular area or subject matter, although not an international person but only a component part, or a political subdivision, of the larger international unit. The term "foreign country" is not a technical or artificial one, and the sense in which it is used in a statute must be determined by reference to the purpose of the particular legislation.

In the case of tariff acts, this Court said in *Stairs* v. *Peaslee*, 18 How. 521, 526, that the word "country" has always been construed "to embrace all the possessions of a foreign State, however widely separated, which are subject to the same supreme executive and legislative control."

It is quite often found necessary, in construing provisions in tariff acts, to conclude that a certain term has varying meanings, according to its use and context. An example is the word "import." This term may mean to bring goods within the jurisdictional limits of the country. *United States* v. *Field*, 14 Ct. Cust. Appls. 406, T. D. 42052; *United States* v. *Boshell*, 14 Ct. Cust. Appls. 273, T. D. 41884; or it may mean the time when it is withdrawn from warehouse and enters the commerce of the country. *Casazza & Bro.* v. *United States*, 13 Ct. Cust. Appls. 627, T. D. 41481; *May Co.* v. *United States*, 12 Ct. Cust. Appls. 266, T. D. 40270.

In our opinion the term "foreign country," as used in these acts with reference to the particular provisions of the act relative to whale oil, is broad and extensive enough to cover whale oil produced upon the high seas by fisheries other than those of the United States. When such oil is brought within the customs jurisdiction of this country, from some place outside of the same, by other than the fisheries of the United States, and is put into the commerce of the country, in our opinion it may be said to be imported from a foreign country and to be dutiable under the acts now under consideration.

Any other construction would result in an absurdity and might permit the destruction of the high-seas fisheries of the United States. The protective feature of the tariff acts now before us, as expressed therein, will be kept in mind when construing them. *United States* v. *Basket Importing Co.*, 15 Ct. Cust. Appls. 161, 165, T. D. 42220.

Such a construction does no violence to the language used by the Congress in this act. As long ago as 1815 the Supreme Court, in *The Brig Concord*, 9 Cranch 386, held that goods captured by an American privateer from a neutral Spanish ship, upon the high seas, and which goods were brought into the jurisdiction of this country, when sold and mingled with the commerce of the country, were dutiable goods.

Again, in *Merritt* v. *One Package of Merchandise*, 30 Fed. 195, the District Court for the Eastern District of New York was considering a cargo of S. S. *Oregon* which had been sunk in the high seas and had been reclaimed by salvors. The merchandise was brought into the

port of New York and was libeled for salvage. The district attorney of the United States filed an intervening claim for duties due upon the goods. The court held that if the goods were sold and became a part of the commerce of the country, they were liable to duties, but held that the lien for salvage was a preferential right and should be first satisfied out of the proceeds of sale.

In view of our conclusions as above stated, it will be unnecessary to discuss the very interesting question raised as to whether a foreign merchant ship constitutes a part of the territory of the country whose flag it bears.

The judgment of the United States Customs Court is *affirmed*.

GARRETT, Judge, concurs in the conclusion.

### CONCURRING OPINION

LENROOT, Judge: I concur in the conclusion reached in the majority opinion in this case, but, as I construe said opinion, it holds that the words "foreign country," as used in Title I of the Tariff Act of 1930, are plain and unambiguous, but nevertheless that, under the rule laid down in *Holy Trinity Church* v. *United States*, 143 U. S. 457, and other cases cited in the majority opinion, the literal construction of the statute need not be followed if, considering other portions of the statute and its legislative history, a meaning may be derived contrary to such literal meaning.

In *Crooks* v. *Harrelson*, 282 U. S. 55, it was held that the literal terms of a statute may be overridden only when the absurdity resulting from the letter of the law is so gross as to shock the general moral or common sense. I do not think that the rule laid down in *Holy Trinity Church* v. *United States*, *supra*, is applicable here because, if the term "foreign country" were not ambiguous, it could not be said that the absurdity arising from a literal construction of that term would be so gross as to shock the general moral or common sense, which is the rule declared in *Crooks* v. *Harrelson*, *supra*.

It is my view, however, that the term "foreign country," as used in said Title I, is not plain and unambiguous and that it is subject to construction.

In the case of *Burnet* v. *Chicago Portrait Co.*, 285 U. S. 1, there was involved the construction of the term "foreign country" as found in the Revenue Act of 1921. Mr. Chief Justice Hughes, writing the opinion of the court, said—

The word "country," in the expression "foreign country," is ambiguous * * * The term "foreign country" is not a technical or artifical one, and the sense in which it is used in a statute must be determined by reference to the purpose of the particular legislation.

There is exactly the same reason for holding that the term "foreign country," as found in Title I of the Tariff Act of 1930, is ambiguous,

as there was for finding the same words to be ambiguous in the Revenue Act of 1921, which latter the Supreme Court has done. Therefore, we must determine from a construction of the entire act, arrived at in all proper ways, the intent of Congress in using the term "foreign country."

When paragraph 1730 (a) of said tariff act, providing for free entry of all products of American fisheries, is considered, it seems plain that it was the intention of Congress to bring within the dutiable provisions of Title I the products of foreign fisheries. This being true, and the term "foreign country" being ambiguous as used in said Title I, said term should not be construed as excluding from the dutiable provisions of said title the products of foreign fisheries, since such a construction would clearly be inconsistent with the manifest intent of Congress as evidenced by the exemption in favor of the products of American fisheries.

As heretofore stated, I *concur* in the conclusion reached by the majority, but in my opinion it should be based upon the ambiguity of the term "foreign country" as used in Title I of said Tariff Act of 1930, and therefore open to construction in order to ascertain the real intent of Congress.