(C. D. 123)

E. E. HOLLER *v.* UNITED STATES

United States Customs Court, Third Division

(Decided March 10, 1939)

*Harper & Harper* (*Abraham Gottfried* of counsel) for the plaintiff.
*Charles D. Lawrence,* Acting Assistant Attorney General (*Samuel D. Spector,* special attorney), for the defendant.

Before CLINE, EVANS, and KEEFE, Judges; EVANS, J., dissenting

KEEFE, Judge: The merchandise here involved consists of fresh cabrilla and pinta fish caught in the Gulf of California. It was assessed for duty at 1 cent per pound under paragraph 717 (a) of the Tariff Act of 1930. The plaintiff claims that the fish are entitled to free entry under paragraph 1730 (a) as the product of American fisheries. The protests were consolidated and it was stipulated between counsel that the evidence produced in protest 919886–G would apply to all of the other protests appearing in the above caption.

The paragraphs in controversy, insofar as they are pertinent, provide as follows:

PAR. 717 (a). Fish, fresh or frozen (whether or not packed in ice), whole, or beheaded or eviscerated or both, but not further advanced (except that the fins may be removed): Halibut, salmon, mackerel, and swordfish, 2 cents per pound; other fish, not specially provided for, 1 cent per pound.

PAR. 1730 (a). All products of American fisheries (including fish, shellfish, and other marine animals, and spermaceti, whale, fish, and other marine animal oils), which have not been landed in a foreign country or which, if so landed, have been landed solely for transshipment without change in condition: *Provided,* That fish the product of American fisheries (except cod, haddock, hake, pollock, cusk, mackerel, and swordfish), landed in a foreign country and there not further advanced than beheaded, eviscerated, packed in ice, frozen, and with fins removed, shall be exempt from duty: *Provided further,* That products of American fisheries, prepared or preserved by an American fishery, on the treaty coasts of Newfoundland, Magdalen Islands, and Labrador, as such coasts are defined in the Convention of 1818 between the United States and Great Britain, shall be exempt from duty.

At the trial D. B. Almond, the owner of the Sonora Fish Co. and of the fishing boat *Mabel;* his brother, L. C. Almond, the master of the *Mabel;* and Raul Garcia, the truckman who transported the fish from Mexico, testified for the plaintiff and presented facts substantially as follows upon which the plaintiff relies to prove that the fish in question are the product of American fisheries.

The fish in question were caught in Kino Bay in the Gulf of California by fishermen from the deck of the fishing boat *Mabel,* a vessel flying the American flag and documented at San Pedro, Calif., as an American vessel. The boat was owned by David B. Almond, an American citizen, who conducted a fish business in Tucson, Ariz., under the name of the Sonora Fish Co. His brother, Lathan C. Almond, also an American citizen, was the master of the vessel having a crew which consisted of three members, an engineer and two deck hands. The crew were all Mexicans. The fish were caught under the jurisdiction of the Cooperativa Pescadora Cardenas, a cooperative society of native fishermen, who supplied extra fishermen to fishing boats upon application of masters of vessels. The fishermen were paid for their labor at a certain price per kilo of fish caught as agreed upon between the individual fishermen and the master of the ship. The master was obliged to take all of the fish caught by these employees. The crew and the master also fished, and the crew, who were paid by the day for their labor upon the boat, were paid extra for the fish they caught, but at a lesser price per kilo than the fishermen assigned by the Cooperativa. The master of the *Mabel* segregated the fish caught by the hired fishermen, his crew, and himself. Certain dues or tribute were paid by the master to the Cooperativa, amounting to 1 centavo per kilo of all the fish caught, the master keeping a record of the catch and paying the sum due to the Cooperativa. Under the Mexican law no one was allowed to fish unless a member of the Cooperativa.

The fish caught during the summer months were taken to Mexico where the Cooperativa is located and there weighed by a truckman hired by the Sonora Fish Co., and engaged in trucking between Mexico and Tucson, Ariz. The truckman had sole charge of the weighing, which was usually performed in the presence of the fishermen and a member of the Cooperativa. The Cooperativa representative, however, had nothing to do with the weighing, nor did he keep an account of the amount of fish caught by the respective fishermen. The truckman was also the financial man who transported the money from the Sonora Fish Co. to the master of the *Mabel,* and payments were made by him to the master of the *Mabel* for the fish he trucked to Tucson. The amount paid to the master for the fish by the truckman was greatly in excess of that received by the fishermen. The difference between the amount paid to the master for the fish

and the cost of catching the same covered the operating expenses and profit of the *Mabel*.

The truck of the Sonora Fish Co. had a capacity of 3,600 kilos. It was the practice of the truckman to transport only the entire catch of the *Mabel* even though it did not equal the capacity of the truck. When the catch was greater than the capacity, the extra quantity was sold to the Cooperativa or to some other truckman. In a few instances where the truckman had purchased additional fish from other truckmen or from the Cooperativa, he kept such fish separate from the catch of the *Mabel* and entered it as dutiable fish and paid the duty thereon, as shown by the entries with protests 928836–G and 928838–G.

A memorandum made out by the truck driver as he weighed the fish covered by protest 919886–G was admitted in evidence as Exhibit 3. This memorandum noted the quantities of each kind of fish caught by the members of the crew of the *Mabel*; by the members of the Cooperativa hired by the master to fish for him; and by the master of the vessel himself. This memorandum also noted a total of 1,147 kilos of cabrilla and 1,140 kilos of pintos. The cabrilla fish were figured at 19 cents per kilo and the pintos at 17 cents per kilo, making a total of $411.73. Against the payment of the sum to the fishermen were advances of merchandise and cash amounting to $148.60, leaving a total to be paid of $263.13. It was taken to a representative of the Cooperativa, who, without the payment of any money, handed the truck driver a bill of sale, called a "factura," which recited the number of kilos of fish of each kind, the cabrillas at 25 centavos per kilo and the pintos at 23 centavos per kilo, total value $548.95. The "factura" also showed that the Sonora Fish Co. of Tucson, Ariz., had purchased for cash from the Cooperativa Fishing Co. of Kino Bay "Lazaro Cardenas" the fish described therein. It was necessary for the truckman to obtain this bill of sale or "factura" from the Cooperativa in order to be permitted to transport the fish from Mexico to the United States.

The only evidence offered on the part of the Government was Exhibit 1, a bill of sale or "factura"; Exhibit 2, an official receipt for the payment of $20, authorized by the Government of the United Mexican States to the Cooperativa Fishing Co. "Lazaro Cardenas" for the registry fee of the *Mabel* in accordance with the Mexican law, and which constitutes a license granted to the Cooperativa, allowing the *Mabel* to engage in fishing; Exhibit 4, the official decree issued by the Mexican Government controlling its fishing interests; and Exhibit 5, an amendment of the law to take effect on August 30, 1938, excluding foreigners from membership in Mexican fishing societies.

Under the Mexican law in force at the time of the importations herein, it was decreed that the catching of fish, especially cabrilla,

was reserved to the Cooperativa Society of Fishermen organized by the regional fishermen, on the understanding that in that cooperative there shall be admitted as associates any who wish to join, natives and foreigners alike, provided that they deliver their entire production to the cooperative society for the sale thereof, either for internal consumption or for exportation through the agency of the cooperative. Under the law as amended, Exhibit 5, the right of belonging to the cooperative society was denied to foreigners. . It will be noted that all of the shipments involved herein were made in the year 1937 and the amended portions of the law do not apply thereto.

The captain of the *Mabel* testified that Exhibit 3 was merely a fishing license issued by the Mexican Government, allowing him to use his boat for fishing, and that, as he was a member of the Cooperativa, he took out the license in the name of the society rather than in his own name.

At the trial counsel for the Government moved to strike out as hearsay the evidence of D. B. Almond. Decision on the motion was reserved and the evidence adduced by this witness was permitted by the trial judge, upon the promise of counsel for the plaintiff that it would be connected by other witnesses so as to show that the fish about which he testified were the same as that at issue herein. This witness testified at length under examination by counsel on both sides. Some of the statements made by him under examination and cross-examination were not based upon his personal knowledge, but whatever was stated was fully covered by plaintiff's subsequent witnesses and the merchandise imported was clearly shown to be the product and industry of the fishing boat *Mabel*. Motion to strike out the testimony of D. B. Almond is denied, and exception granted the Government.

In Government brief counsel moved to dismiss all of the protests except 919886–G for failure of proof, because the conditions at the time the fish in the incorporated protests were caught were not shown to be the same as upon the date governing the fish covered by protest 919886–G. In this connection it will be noted that the Government stipulated and agreed with counsel for the plaintiff that the testimony introduced in protest 919886–G would apply to all of the cases hereinbefore enumerated. The period covered by said protests is from May 24, 1937, to September 11, 1937. As the Government has expressly agreed that the testimony and evidence in the test case shall apply to the protests incorporated the motion is denied.

The plaintiff contends: First, that fish taken by an American vessel with the assistance of foreign fishermen as members of the crew or under the supervision of the master of the vessel are products of American fisheries under article 489 of the Customs Regulations of 1937; second, that under the doctrine of *noscitur ab origine* the fish in question are products of American fisheries for customs purposes,

irrespective of Mexican laws attempting to create a different status, and third, that fish caught upon a vessel of American registry, commanded by an American captain, are products of American fisheries and entitled to free entry even though sold in a foreign country to foreign citizens.

The Government, on the other hand, contends that the vessel was not of American registry and was owned and operated by the Cooperativa Fishing Co. "Lazero Cardenas"; that under the Mexican law the right to catch fish was reserved exclusively to the Cooperativa; and that to admit the fish as the product of American fisheries would approve of a conspiracy to defraud the Mexican Government out of its revenue and sanction the flaunting of Mexican laws.

American fisheries have long been the subject of decision by this and the appellate courts. In *United States* v. *Reading*, 1 Ct. Cust. Appls. 515, T. D. 31534, American fisheries was defined as an enterprise conducted by an American fishing vessel, flying the American flag, manned by American sailors. In *United States* v. *Burdett*, 24 Fed. Cas. 1300, fish of American fisheries were characterized by their first taking and take their character from their origin. In *Robbins* v. *United States*, G. A. 8952, T. D. 40728, it was held immaterial whether the fish pass into the hands of others or what their ownership may have been. if they enter the United States without being changed in character. See also *New England Fish Co.* v. *United States*, 15 Ct. Cust. Appls. 34, T. D. 42137. In the case of *In re Winsor*, G. A. 5453, T. D. 24738, it was held immaterial whether the fishing vessel is licensed to fish by a foreign government, and it was also held immaterial whether or not the fish were caught with the assistance of men, boats, and gear hired in the foreign country for that purpose.

The question before us is whether these fish caught from a boat of American registry, having an American captain, can be regarded as exempt from duty as the product of American fisheries, when landed in a foreign country and there not further advanced than beheaded, the fins removed, eviscerated, and packed in ice, and so landed solely for transshipment to the United States. Under the ruling of the courts and the customs regulations, article 489, Customs Regulations of 1937, fish that are caught from a ship of American registry by foreign fishermen hired by the master of the ship for that purpose, without doubt, remain the product of American fisheries. See *United States* v. *Reading, supra,* and *United States* v. *Post*, 5 Ct. Cust. Appls. 130, T. D. 34188. That the fish were landed in Mexico and from there transshipped to the United States is immaterial because of the fact that the fish were not further advanced than permitted by the statute. The courts have held that the exemption from duty upon fish the product of American fisheries is derived from the character of the fish at the time of their taking under the doctrine of *noscitur ab origine.*

That being true, then the fact that a foreign law requires fish taken under its jurisdiction to be sold to certain foreign societies for resale is also immaterial when it has been clearly proven that the fish taken by the American fishery were actually shipped to the United States without any advancement beyond that allowed by the statute. Here it has been proven that the fish were not sold to the foreign society or changed in condition. In the case of *Bush* v. *United States*, T. D. 40725, the halibut there in question was a product of American fisheries even though it was sold in the foreign country, frozen by Canadian workmen, and thereafter shipped to the United States. As stated by counsel for the plaintiff in his brief, "if this fishery meets the requirements laid down by American law, its products are entitled to free entry, even though, under Mexican law, it would be considered as a Mexican fishery." The privilege sought to be exercised is one granted by the United States to its own citizens and such privilege cannot be circumscribed by any foreign statute.

For the reasons stated we hold that the fish in question are entitled to free entry as the products of an American fishery under paragraph 1730 (a), Tariff Act of 1930, and judgment will be entered directing the collector of customs to reliquidate the entries and to make refund accordingly.

### DISSENTING OPINION

EVANS, Judge: I regret not to have been able to agree with the majority opinion in this case for the reason that I cannot accept the interpretation of the facts as they have been outlined by the witnesses because in my judgment the statements of said witnesses are contradicted by records made by the plaintiff or through its agencies. For instance, in the first place, it clearly appears by Collective Exhibit 1 that the *Mabel*, after having been documented in the United States, was registered by the Cooperative de Pescadoras "Lazaro Cardenas," under date of March 17, 1937 (Exhibit 2). The witnesses attempted to raise the inference that Exhibit 2 was merely a fishing license. I do not believe a witness can be heard to contradict the statements on this document, to wit, that the 20 pesos paid was a registry fee for the *Mabel*. If we assume that it was a fishing license then it granted such license to the Cooperative de Pescadoras Lazaro Cardenas. Under Exhibit 4 as translated the Mexican Government had reserved the fishing rights of certain parts of the Gulf of California to be ceded to the Cooperative Society of Fishermen—

on the understanding that in that Cooperative there shall be admitted as associates anyone who wishes to join, natives or foreigners, provided that they deliver their entire production to the Cooperative for the sale thereof either for internal consumption within the Republic or for exportation, through the agency of the Cooperative.

The purpose of making this reservation is stated in the last para-graph of the preamble of the decree in the following language:

WHEREAS: It is the obligation of the Federal Government to prevent possible disadvantageous competition on the part of foreign enterprises for our native fishermen, specifying those waters which should be reserved for the exclusive use of the aforesaid fishermen, thus presenting a united front to foreign buyers who wish to control and to set prices on the national fishing products with serious damage to the interests of the collectivity and of the Government itself:   *   *   *

Article 1 of the decree provides as follows:

ARTICLE 1. The fishing zone north from Parallel 27 in the Gulf of California is declared to be a zone of common exploitation, devoted to the exclusive use of the regional fishermen.

The record indicates that an organization known as the Cooperative Fishing Co. of Kino Bay, Lazaro Cardenas, was operating at Kino Bay, Sonora, Mexico, under the provisions of the Mexican decree above quoted.   If we accept as true that these fish in suit were caught by the *Mabel* under the supervision of her captain, they could only have been taken lawfully pursuant to the fact that the *Mabel* was licensed to operate under the Cooperative Society of Fishermen above noted and under the provisions of the Mexican decree that the take of fish should have been delivered to the Cooperative for sale.   That such was the procedure is established by Collective Exhibit 1 which shows that 1,147 kilos of cabrillas and 1,140 kilos of pintas, the identical quantities of these respective types of fish imported, were bought on July 9 from the Sociedad Cooperative de Pescadoreres de Bahia Kino "Lazaro Cardenas."   The invoice or factura is No. 277 and was entered in folio No. 177 of the books of that Cooperative. It shows that the fish were purchased by the Sonora Fish Co.   The statement by one of the witnesses that he had to get this bill in order to get the fish out of Mexico does not eliminate the fact that he was compelled under the law to get the fish from the Cooperative.

Since the documentary evidence shows that the fish covered by protest 919886-G were caught from the boats and weighed on July 7 and were sold to the Sonora Fish Co. on July 9, such fish were constructively at least in possession of the Cooperative, and under the provisions of Collective Exhibit 4 they could be sold only for exportation by the Cooperative.   I therefore think that they ceased to be the product of American fisheries.   Article 477 (*d*) of the Customs Regulations of 1931, and its predecessor, article 449 of the Customs Regulations of 1923, provide:

*   *   *   The purchase by the owner, agent, master, or crew of an American vessel of fish or other marine products taken by the citizens of another country in foreign waters will subject such fish or other marine products to treatment as foreign merchandise.

Furthermore, the checking list (Exhibit 3) made out when the fish were weighed on July 7, 1937, shows the identical quantity of fish covered by the factura.   This exhibit, in my judgment, contradicts

some of the testimony in this record in that it indicates that part of the fish were caught by the boat, part by the Cooperativa, which we interpret to mean fishermen under the Cooperativa, part by the master of the boat, and part by Juan. The testimony shows that besides the master there were an engineer and two additional employees to carry on the operation of the *Mabel* regularly. In all, four men regularly attached to the boat, one the master, one the engineer, and two whom the master called laborers. The testimony shows that they hired five extra fishermen besides the crew on the trip on which the fish covered by protest 919886–G were caught.

Exhibit 3 shows the catch of the master on this trip to have been 66 kilos, the catch of one person called Juan to have been 70 kilos. Since the list notes the name of the master and his catch, together with one other person and his catch, it is fair to presume that Juan was a member of the crew, and I think it is a fair inference that no other member of the crew engaged in taking fish. But assume that they were so engaged, then they must have represented the boat and you would therefore have two men operating from the boat with a catch of 1,142 kilos as against five men operating from the Cooperativa with a take of 1,009 kilos. Assuming that the engineer had no obligation to stand by his engine, the record would disclose that he and the other laborer had extraordinary luck, which I am willing to concede does befall some fishermen at some times, but not in such an extraordinary degree as is disclosed by this document.

In my judgment the testimony discloses a willingness and an intention to circumvent the laws of Mexico if we accept the statement that they did not sell any fish to the Cooperativa and did not buy any from the Cooperativa. If they would act in collusion to thwart the laws of Mexico it would stand to reason that they would do likewise with reference to the tariff laws of this country.

I therefore think the claims of the plaintiff should be overruled.